IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 24-373 |
| | : | |
| DERRICK DUNCAN | : | |

**MEMORANDUM**

**Judge Juan R. Sánchez**                                                                 **July 31, 2025**

On October 17, 2024, Defendant Derrick Duncan was indicted on one count of possession of a firearm by a felon under 18 U.S.C. § 922(g)(1), stemming from an arrest on July 17, 2024. Duncan has moved to suppress the firearm, arguing law enforcement lacked legal basis for his seizure and the resultant search of his bag. Because Duncan's seizure and the search of his bag were lawful, the motion to suppress will be denied.

**FINDINGS OF FACT**[1]

1. On July 17, 2024, Officer Zachary Zgleszewski[2] was on duty in Philadelphia's 39th District with his partner, Officer Baker. Tr. Suppress Hr'g, 5:16-25, ECF No. 29. At approximately 11:55 a.m., Officers Zgleszewski and Baker, while driving westbound in a marked police vehicle on the 1800 block of West Allegheny, observed Defendant Duncan wearing a multi-colored crossbody bag across his chest and walking eastbound with another man.[3] *Id*. at 6:1-15.

---

[1] The following factual findings are based on the evidence presented at the suppression hearing on May 1, 2025, including: (1) testimony from Officer Zachary Zgleszewski; and (2) video footage from a body-worn camera.

[2] Officer Zgleszewski is a ten-year veteran of the Philadelphia Police Department (PPD). He has spent most of that time working in the 39th District.

[3] The man walking with Duncan was never identified and is not part of this case.

1

2. As the police vehicle passed Duncan and the man, Officer Zgleszewski observed Duncan look at the officers, look down at his bag, and look over his left shoulder at the officers once again before moving the bag from his front right side to his back right side. According to Officer Zgleszewski, the bag swung "freely," indicating there was a weighted object in the bag. *Id*. at 6:11-7:15; 35:17-36:2. Officer Zgleszewski believed the weighted object was a firearm because he has noticed an increase in the use of crossbody bags to carry firearms in the last five years and has personally recovered or witnessed the recovery of firearms in crossbody bags. *Id*. at 9:7-10:7. He also testified that the 39th District is a "high crime area" based on his experience responding to "shootings, homicides, [and] pointed-gun robberies." *Id*. at 10:16-24. In particular, he had a firearm arrest "at the same intersection." *Id*.

3. The officers made a U-turn into the eastbound lane and pulled up slightly ahead of Duncan and the other man. Officer Zgleszewski exited from the passenger side and approached as Duncan and the other man continued walking eastbound. *Id*. at 12:1-7; Officer Zgleszewski Body Cam at 0:16, Gov't Ex. 1.[4] While Duncan and the other man walked past, Officer Zgleszewski asked Duncan if he had a firearm or a permit to carry. Duncan, continuing to walk eastbound, turned to face Officer Zgleszewski and emptied his pockets saying, "I don't have a firearm. You can't stop me." Tr. Suppress Hr'g, 12:1-13:4; Gov't Ex. 1 at 0:20-0:39. Officer Zgleszewski then asked whether there was a firearm in Duncan's crossbody bag. Duncan responded, "You can't stop me" and continued to walk backwards eastbound. Officer Zgleszewski gestured at the bag again and stated, "I know there is a

---

[4] The body-worn camera footage spans the beginning of the interaction on sidewalk to Duncan's arrest. However, there is no audio until about 60 seconds into the video—when Officer Zgleszewski is in mid pursuit of Duncan.

firearm in the bag." Tr. Suppress Hr'g, 13:5-19. According to Officer Zgleszewski, Duncan's act of turning to face him during the encounter was a deliberate move to angle the side of the body carrying the bag away from his line of sight. *Id*. at 13:5-11; 41:1-3; 43:1-2. Duncan continued to walk backwards for a few seconds before turning and running. Gov't Ex. 1 at 0:27-0:39.

4. With Officer Zgleszewski pursuing him, Duncan ran eastbound on West Allegheny before cutting through traffic to the other side of the street. Duncan then cut through traffic again before turning right onto the 1700 block of Lippincott Street. He continued down Lippincott Street until he got tangled up in some brush and fell in an empty lot. Tr. Suppress Hr'g, 15:6-10; Gov't Ex. 1 at 0:40-1:01. The entire pursuit lasted less than 60 seconds. During the pursuit, Officer Zgleszewski observed that Duncan was holding the bag close to his body "like a football." Tr. Suppress Hr'g, 15:15-19. Officer Zgleszewski notified police radio of the pursuit and stated that Duncan had a firearm in the crossbody bag. *Id*. at 15:20-16:3.

5. Duncan was on the ground in the empty lot when Officer Zgleszewski approached with his taser out, commanding Duncan to put his hands behind his back. Two PPD Highway Patrol officers responded as backup and helped Officer Zgleszewski place Duncan in handcuffs. As he was apprehending Duncan, Officer Zgleszewski frisked the bag and felt what he believed to be a firearm. *Id*. at 16:6-14; Gov't Ex. 1 at 1:25-2:05.

6. One of the Highway Patrol officers cut the bag from Duncan's body and handed it to Officer Zgleszewski, who retrieved a black Taurus G2C 9mm semi-automatic pistol loaded with twelve rounds of ammunition. Tr. Suppress Hr'g, 17:8-18:9; Gov't Ex. 2. Officer Zgleszewski then verified if Duncan had a permit to carry a firearm through PPD's

3

computer database. Officer Zgleszewski learned that Duncan did not have a permit and arrested him. Tr. Suppress Hr'g, 17:21-23.

7. The Court finds Officer Zgleszewski's testimony credible in all respects. His testimony, with respect to the sidewalk interaction and Duncan's arrest, was corroborated by body camera footage. The Court also challenged him on the stand, and he answered all questions in a straightforward manner.

**LEGAL STANDARD**

The Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, "not every interaction between a police officer and a citizen is protected by the Fourth Amendment." *United States v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009). Rather, police encounters with citizens "fall into one of three broad categories, each with varying degrees of constitutional scrutiny: '(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests.'" *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014) (quoting *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006)). The first category (i.e., mere encounters) refers to non-coercive interactions between a police officer and a citizen where the citizen is free to leave and is not under any legal compulsion to cooperate. *See, e.g.*, *United States v. Drayton*, 536 U.S. 194, 201 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search . . . provided they do not induce cooperation by coercive means."). Mere encounters "do not amount to Fourth Amendment seizures . . . because the citizen has the ability to engage in or terminate the encounter." *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009).

The second category of interactions (i.e., brief seizures or *Terry* stops) is considered a seizure under the Fourth Amendment and "requires a showing that the officer acted with reasonable suspicion." *Brown*, 765 F.3d at 288. A *Terry* seizure "can occur in two ways: (1) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (2) 'submission to a show of authority.'" *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Reasonable suspicion means "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). This standard "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

In determining whether reasonable, articulable suspicion exists for a *Terry* stop, the first step is to pinpoint "the timing of the seizure." *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008). Once the timing is established, courts must consider the "totality of the circumstances" at the time of the seizure to determine whether the officer had reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). If a *Terry* stop is "conducted without reasonable suspicion of criminal activity, any evidence obtained must be suppressed as fruit of the poisonous tree." *United States v. Amos*, 88 F.4th 446, 451 (3d Cir. 2023) (internal quotation marks and citation omitted).

Furthermore, "[d]uring the course of a *Terry* stop, reasonable suspicion can escalate to probable cause, justifying an arrest." *United States v. Pitts*, 497 F. App'x 252, 254 (3d Cir. 2012). "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (internal quotation marks and citation omitted).

**DISCUSSION**

Duncan moves to suppress the firearm recovered from the July 17, 2024 arrest. Mot. Suppress, ECF No. 18. He argues law enforcement lacked reasonable suspicion for his seizure and lacked probable cause to search his crossbody bag. ECF No. 18 at 1. The government opposes. Gov't Opp. 5, ECF No. 22. Because law enforcement had reasonable suspicion to seize Duncan and probable cause to search the bag, the motion to suppress will be denied.

The Court must first determine when Duncan was seized. Duncan argues he was seized when the officers approached him on the sidewalk of 1800 West Allegheny. ECF No. 18 at 4-7. The Government asserts Duncan was only seized after he took flight and was apprehended in the empty lot on 1700 Lippincott Street. The Court agrees with the Government. Officers Zgleszewski and Baker never touched Duncan at any point during the interaction on the sidewalk, nor did they restrain Duncan's movement. Therefore, the only way Duncan could have been seized on the sidewalk is if he submitted to Officers Zgleszewski and Baker's show of authority.

"[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628 (citation omitted). In making this determination, courts consider the totality of the circumstances, including the following factors: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Officers Zgleszewski and Baker did not display a firearm or taser during the interaction on the sidewalk. The officers never touched Duncan or impeded his path—he was able to continue

6

walking eastbound on West Allegheny when the officers approached. The officers remained a few feet away from Duncan for most of the interaction. Officer Zgleszewski asked limited questions of Duncan about his possession of firearms and a permit to carry firearms but never instructed Duncan to answer or stop walking. Thus, Duncan was not seized on the sidewalk because there was no show of authority from the officers.[5] Accordingly, the Court finds that Duncan's interaction with Officers Zgleszewski and Baker on the sidewalk was a mere encounter, not a seizure under the Fourth Amendment.

Duncan was seized in the empty lot on Lippincott Street after he fled from Officer Zgleszewski and was subsequently apprehended and handcuffed. The officers had reasonable suspicion for this seizure. At the time of the seizure, Officer Zgleszewski observed Duncan, upon seeing the police vehicle drive by, do a double take and move the crossbody bag away from the officers' line of sight. Officer Zgleszewski then approached Duncan with questions about his possession of a firearm, and Duncan responded with non-answers such as emptying his pockets and repeatedly stating, "You can't stop me." Officer Zgleszewski then observed Duncan run through traffic in an attempt to escape. As Duncan ran, Officer Zgleszewski observed Duncan hold the bag tight to his body "like a football"—leading Officer Zgleszewski to inform police radio that Duncan had a firearm. All of this, combined with Officer Zgleszewski's testimony that this area was a "high crime" area, Tr. Suppress Hr'g, 10:16-24, amounts to a "particularized and objective basis for suspecting" Duncan of criminal activity. *See United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *see also Wardlow*, 528 U.S. at 124-25 (holding that unprovoked flight in "high crime

---

[5] Even if there was a show of authority by Officer Zgleszewski, it could only have been a seizure if Duncan submitted—which did not happen here. *Amos*, 88 F.4th at 455 (holding that a defendant's "brief pause and halfway hand raise" to officers' commands before fleeing "was not a submission to the officers' show of authority").

area" is sufficient reasonable suspicion for a seizure); *United States v. Bonner*, 363 F.3d 213, 218 (3d Cir. 2004) (finding that "[f]light from a non-consensual, legitimate traffic stop . . . gives rise to reasonable suspicion").

Police "may seize contraband during a lawful-pat if the contraband's 'contour or mass makes its identity apparent.' This [doctrine] permits an officer to seize an object when, given his training and experience, he develops probable cause to believe it is contraband (1) by the time he concludes it is not a weapon and (2) 'in a manner consistent with a routine frisk.'" *United States v. Greene*, 927 F.3d 723, 726 (3d Cir. 2019) (citations omitted). After frisking the bag, Officer Zgleszewski had probable cause to search it. Officer Zgleszewski testified that, upon feeling Duncan's bag, he knew it was a firearm based on his training and experience. He subsequently opened the bag and retrieved a black Taurus g2C 9mm semi-automatic pistol. Once Officer Zgleszewski verified that Duncan did not have a permit to carry the firearm, he had probable cause to arrest Duncan.

**CONCLUSIONS OF LAW**

1. Duncan was not seized on the sidewalk of 1800 West Allegheny by Officers Zgleszewski and Baker.
2. Duncan was seized in the empty lot on 1700 Lippincott by Officer Zgleszewski.
3. Officer Zgleszewski had reasonable suspicion for the seizure.
4. Officer Zgleszewski had probable cause to search Duncan's crossbody bag and probable cause to arrest Duncan.

Accordingly, the motion to suppress the firearm is denied. An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.